## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**UNITED STATES OF AMERICA,**          **CRIMINAL NO. 09-20304**

                           **Plaintiff,**          **HONORABLE GERALD E. ROSEN**

**v.**

**XIANG DONG YU,**
          **aka Mike Yu,**

                           **Defendant.**
_____

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its undersigned attorneys, respectfully submits this sentencing memorandum to inform the Court of its position at sentencing.  Pursuant to a Rule 11 plea agreement, on November 17, 2010, the defendant pleaded guilty to Counts Two and Three of the indictment, charging theft of trade secrets, in violation of 18 U.S.C. § 1832.  As set forth in the plea agreement, the defendant stole trade secrets from the Ford Motor Company which the parties agree have a value of  between $50 million and $100 million.  The parties have also agreed to a Sentencing Guidelines range of 63 to 78 months' imprisonment.  As discussed below, based on that Sentencing Guidelines range and the other sentencing factors set forth in 18 U.S.C. § 3553(a), the government recommends that the defendant be sentenced to a term of imprisonment at the upper end of the Sentencing

Guidelines range of 63 to 78 months' imprisonment.

## I. BACKGROUND

The investigation in this case revealed that the defendant, over a period of four years, stole sensitive automotive design information from the Ford Motor Company ("Ford") and repeatedly compromised that information by sharing it with representatives of competing Chinese automotive companies. In some instances, the defendant acted to enhance his employment prospects with those companies; in other instances, the defendant intended that Chinese competitors of Ford benefit from Ford's trade secret information.

The defendant began working for Ford as a Product Engineer in September, 1997. In that capacity, the defendant had access to trade secrets owned by Ford, including documents known as System Design Specifications (or "SDSs"). System Design Specifications are critical to Ford's design and manufacturing processes. These documents, each of which comprise several hundred pages, set forth the detailed performance requirements for numerous aspects of the major components of Ford vehicles. The forty-one SDSs stolen by the defendant in this case include the SDSs for the "Body System," "Electric Distribution," "Engine System," and "Suspension System." Ford has invested many millions of dollars over a period of decades in formulating, updating, and testing the performance requirements set forth in its SDSs. In addition to performance requirements, the SDSs set forth detailed verification testing methods which are designed to ensure that the performance requirements are met. Ford suppliers of component parts much meet the performance

requirements set forth in the SDSs.  Ford design engineers ensure that a new model's component systems meet them as well.  Ford quality and uniform production standards are maintained through adherence to Ford SDS performance requirements.

While employed with Ford, the defendant also had access to trade secret information contained in Attribute Requirements Lists (ARL).  ARLs address the qualitative attributes of vehicles, such as noise and vibration, durability, safety, and fuel economy.  They also set forth benchmarks for testing and verifying that vehicles meet the attribute standards.  Both the SDSs and ARLs contain numerous pieces of sensitive design and testing information considered as trade secrets by Ford.  Ford protects the secrecy of these design documents through a number of security measures.

In July, 2005, the defendant, a Chinese citizen, was in email communication with several automotive companies in China about a job.  The defendant traveled to China for purposes of interviewing with those companies about prospective employment.  The defendant's trip to China had nothing to do with his Ford job yet he took sensitive Ford design documents with him.  In preparation for his meetings with Chinese automotive representatives, the defendant loaded at least three Ford SDSs and other Ford proprietary documents onto a personal thumb drive.  When later questioned by a Ford security official, the defendant offered no explanation for taking Ford trade secret documents to China, stating that he did not know why he had done so.  During a proffer with law enforcement after his arrest, the defendant admitted that he had shown Ford trade secret documents during a

presentation to Foton, one of the Chinese automotive companies with whom he interviewed. During the defendant's earlier interview with Ford security, he neither mentioned meeting with Foton representatives nor that he had shared Ford trade secret information with them.

Ford received an anonymous email in December, 2006.  Later investigation determined that the email was from a former girlfriend of the defendant's living in China. In her email, she stated that the defendant had interviewed with Chinese automotive companies in 2005 and had provided Ford documents to the Jiang Huai Automotive Company, a competitor of Ford.  She further stated that the defendant had left the thumb drive containing Ford documents at her residence and attached portions of three Ford SDSs to her email.  A review of the defendant's emails confirmed that he met with representatives of the Jiang Huai Automotive Company in July 2005.

During his interview with Ford security, the defendant insisted that he had only "visited" Jiang Huai and other Chinese automotive companies but did not interview with them.  When Ford security asked the defendant how people would react to his transfer of Ford documents to a Chinese automotive company, the defendant responded, "they would believe you."  Subsequently, during his proffer, the defendant admitted that he had the thumb drive with Ford documents with him when he interviewed with Jiang Huai, although he denied that he had provided Ford documents to that company.

Email communications reveal that the defendant was in employment negotiations with Jiang Huai for several months.  In December, 2005, Jiang Huai offered the defendant a job,

4

which he accepted.  The defendant did not inform Ford about his new employment.  Instead, he lied to Ford representatives, falsely claiming that his mother in China had suffered a heart attack and that he needed an emergency leave of absence to care for her.  The defendant then traveled to China and began working for Jiang Huai in January, 2006.  According to the defendant, he took Ford SDSs on a personal laptop and a thumb drive with him to his new job.  The defendant also admitted that he used Ford proprietary documents in a presentation to Jiang Huai employees.  The defendant worked for Jiang Huai for approximately four weeks and then quit, falsely telling Jiang Huai representatives that health problems necessitated his return to the United States.  The defendant then resumed working at his job with Ford in February, 2006.

In June, 2006, the defendant received a poor performance evaluation and was assigned a partner to assist in projects.  Emails revealed that a few months later, in August, 2006, the defendant renewed his efforts to find a new job.  Foxconn, PCE Industry, Inc. ultimately offered the defendant a job, which he accepted in writing on December 11, 2006.  Foxconn, PCE Industry, Inc. manufactures electronic and computer products, including automotive electronic products.

The defendant did not immediately inform Ford that he was leaving the company.  On December 14 and 19, 2006, the defendant copied over four thousand Ford proprietary documents from his Ford work computer to an external hard drive.  Those documents included forty-one Ford SDSs and ten ARLs, comprising many thousands of pages of Ford

automotive design information. The vast majority of the SDSs that the defendant loaded onto his external drive had nothing to do with his work at Ford.

The defendant's activities on the eve of his departure from Ford reflect that he targeted certain information to take from Ford -- presumably what he thought would be of most economic benefit to himself or a third party in the future. The FBI's computer forensic examination revealed that the defendant selectively copied documents from his Ford computer to the external hard drive. In addition, the defendant purposefully accessed the Ford intranet system on December 15, 2006, to obtain three SDSs relating to electronics, the principal business of his new employer and a subject wholly unrelated to the defendant's work at Ford.[1]  He then copied these SDSs to an external drive on December 19, 2006.

The defendant later claimed in a proffer that he stole the Ford documents in order to "refresh" his knowledge should he decide to return to the automotive industry in the future. In fact, the defendant's Ford supervisors, and the defendant himself, indicated that the vast majority of the forty-one SDSs did not relate to the defendant's Ford work, i.e., the defendant

---

[1]  The defendant claimed during a proffer that he downloaded SDSs relating to electronics systems on December 15, 2006 because his supervisor had mentioned that he might be tasked with working on a window regulator program, an electrical part. The defendant's explanation is highly suspect for a number of reasons. First, it strains credulity to believe that the defendant downloaded thousands of pages comprising the entirety of three electrical SDSs before he was actually assigned a task relating to an electrical part. Moreover, as of December 15, 2006, in light of a planned trip to China, the defendant had only two business days remaining at Ford before his planned departure from Ford on January 5, 2007. Lastly, the defendant's supervisor refutes the defendant's claim; he never indicated to the defendant that he might work on the window regulator program and had another engineer already working full-time on that program.

had no work experience or knowledge that the stolen documents *could* have "refreshed." Such a claim is also refuted by the defendant's efforts on December 15, 2006, to secure – for the first time – copies of electrical systems SDSs which were also unrelated to his Ford work.

The defendant finished copying the Ford documents onto an external drive at 10:16 p.m. on December 19, 2006, a day he had taken as a vacation day from Ford. The following day, on December 20, 2006, the defendant boarded a plane to China, taking the hard drive containing the Ford trade secret documents with him. He traveled to the city of Shenzhen, China, the manufacturing hub of Foxconn, PCE Industry, Inc. and the defendant's assigned work location for that company. He met there with Foxconn representatives. During the proffer, the defendant stated that he left the external drive containing the Ford trade secret documents at a Foxconn manager's residence in China, intending to retrieve it and other items when he returned to Foxconn in early January 2007. The defendant provided neither a plausible explanation for taking the external drive containing the Ford documents to Foxconn in the first instance, nor one for leaving it with a Foxconn representative.

After meeting with Foxconn representatives for several days, the defendant traveled on to Nanjing, China for a class reunion. According to email communications, the defendant gave an automotive design presentation during that reunion. The defendant later admitted to law enforcement that he showed Ford trade secret information during the reunion presentation.

On January 2, 2007, the defendant emailed his Ford supervisor from China and told

7

him that he had accepted a new job. The defendant wrote that he would return to the United States in early January and would leave Ford's employment a few days later.

The defendant returned to the United States on January 3, 2007. On his last day with Ford on January 4, 2007, a Ford representative conducted an exit interview with the defendant during which he was reminded that he was prohibited from taking Ford proprietary information with him when he left Ford's employ. At that time, the defendant said nothing about the thousands of Ford proprietary documents that he had already taken to China and were then in the possession of a Foxconn manager.

On January 8, 2007, the defendant began working for Foxconn in Shenzhen, China. In March 2008, the defendant again sought new employment, this time with an automotive company in China called Shanghai Automotive Industry Corporation (SAIC), a competitor of Ford. In preparation for an interview with that company, the defendant created a document culled together from Ford trade secret documents relating to Ford's engineering resolution of a problem with the liftgate of some of its vehicles. In creating the new document, it is apparent from the changes the defendant made to the original Ford trade secret documents that he intended to provide the document to SAIC representatives. First, the defendant deleted all Ford proprietary markings from the documents. Second, the defendant deleted all references to other participants in the project, identifying himself prominently on the first page of the document in an attempt to claim ownership of this Ford project.

Throughout the fall of 2008, the defendant continued to look for a job with Chinese automotive companies. In August, 2008, the defendant interviewed with Chery Automotive and presented the same Ford trade secret information to its representatives that he had created for SAIC. In addition, a computer forensic examination revealed that on August 28, 2008, the defendant created two folders on his external hard drive entitled "SDS" and "DSD" and then moved Ford SDSs into those folders, making them more readily retrievable from the hard drive. During this same time period, the defendant was in contact with Beijing Automotive Company (BAC) about employment. By an email dated October 19, 2008, the defendant informed Foxconn officials that he was leaving their employ as of November 5, 2008 to begin working for BAC. BAC is a competitor of Ford.

On October 14, 2009, the defendant returned to the United States, flying into Chicago from China. Upon his arrival, the defendant was arrested on a warrant issued upon the indictment in this case. At that time, the defendant had in his possession his Beijing Automotive Company laptop computer. Upon examination of that computer, the FBI discovered thousands of Ford proprietary documents, including forty-one SDSs and ten Ford ARLs. In addition, the FBI discovered Foxconn proprietary documents and hundreds of highly sensitive trade secret documents belonging to a client of Foxconn.

According to the defendant's proffer to law enforcement, in November 2008, he copied the Ford documents from his external drive to a personal laptop computer he used in conjunction with his work with BAC. The defendant claimed that he wanted the Ford

documents with him in conjunction with his BAC job so he could "refresh" his knowledge, a highly suspect explanation given the lack of correlation between his Ford work and the stolen SDSs. In January, 2009, the defendant was assigned a laptop computer by BAC. The defendant then copied the Ford documents from his external hard drive to his BAC work laptop. The defendant then gave his personal laptop containing the Ford trade secret documents to a BAC employee. The defendant claimed that he told this BAC employee not to look at documents stored on the computer.

The defendant claimed that he gave one Ford System Design Specification to a BAC colleague and other Ford proprietary information to BAC employees on two occasions. He also asserted that he, himself, used only two SDS in conjunction with his own BAC work. These claims are flatly contradicted by the FBI's computer forensic examination of the defendant's BAC computer. The FBI determined that each of the forty-one Ford System Design Specifications found on the defendant's BAC work laptop had been accessed by the defendant during the time of his employment with BAC. When confronted with these forensic results, the defendant claimed that he only accessed the Ford documents to quickly open and close them in order to determine their content because the SDS file names were not descriptive. The defendant's explanation is contradicted by the file names themselves. In fact, the SDS files were named in an obvious fashion (e.g. "chassis," "electricpower," "wipers," "frame," "sidedoor," "liftgate," "seat" etc.) and had been so named from the time the defendant stole them from Ford.

The FBI also determined that the defendant had accessed hundreds of Foxconn-related documents after the defendant left that company's employ.[2]   During interviews with law enforcement, the defendant stated that he could not explain why he accessed the Foxconn documents during his employment with BAC.

## II. FASHIONING AN APPROPRIATE SENTENCE UNDER THE LEGAL FRAMEWORK

### A.    The Sentencing Guidelines Range

As this Court is well-aware, although the Sentencing Guidelines are now advisory, a sentencing court is required "to begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49-50 (2007); *Kimbrough v. United States*, 552 U.S. 85, 108 (2007)(noting that "district courts must treat the Guidelines as the 'starting point and initial benchmark'" in imposing sentence)(citation omitted).

In this case, there is no dispute between the parties as to the correct Sentencing Guidelines range.[3]   Pursuant to the Rule 11 agreement, the parties have agreed that the

---

[2]   While a computer forensic examination can determine when a document was last "accessed," it cannot determine what action was taken with respect to the document (i.e. whether it was printed, copied, transmitted or simply viewed).

[3]   The Presentence Report (PSR) calculates the Sentencing Guidelines range of 78 to 97 months based on Criminal History Category II.  The PSR adds two criminal history points under U.S.S.G. § 4A1.1(d), asserting that the defendant was on probation at the time he committed the instant offense, including relevant conduct.  See U.S.S.G. § 4A1.1(d), App. Note 4.  Relevant conduct, according to the PSR, includes the defendant's 2005 conduct when he was still on probation.  It does not appear, however, that the 2005 conduct was committed "during the commission of the offense of conviction, in

11

Sentencing Guidelines range is 63 to 78 months' imprisonment based on a loss of between $50 and $100 million.   The parties' calculation also includes a one-level downward departure, pursuant to § 5K2(a)(2)(B), based on the defendant's efforts in obtaining electronic devices from China on which he copied the Ford trade secret information and in providing those computers to the FBI.

The agreed loss amount is based only on the labor costs incurred by Ford in creating and maintaining the SDSs and ARLs.  This approach to calculating loss is consistent with a specific Application Note in the Sentencing Guidelines that provides that an appropriate loss calculation can be estimated at, "[i]n the case of proprietary information (e.g., trade secrets), the cost of developing that information . . ." U.S.S.G. §2B1.1, App. Note 3(C)(ii).  That said, ascertaining labor costs is a conservative way of calculating loss.  The calculations do not include all development costs.  For instance, labor costs exclude Ford's significant investment in testing equipment and the development of testing procedures to evaluate possible requirements before their adoption and inclusion in SDSs and ARLs.[4]

In addition, the loss amount does not include the value of the hundreds of trade secret documents belonging to a  Foxconn client that the defendant misappropriated.

------

preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."  U.S.S.G. § 1B1.3(a)(1)(A).

[4] Had the defendant proceeded to trial in this case, the government, in conjunction with Ford, would have expended the time and effort to ascertain the additional development costs associated with the SDSs and ARLs.

Those documents relate to extremely sensitive developmental aspects of new products for that company.  Ascertaining the value would be time-consuming and resource intensive and was not undertaken in light of the defendant's guilty plea.  In light of the conservative nature of the loss calculations, the government's recommendation for a sentence at the upper end of the sentencing guidelines range is appropriate.

Once the Court determines the correct sentencing guidelines range, it must then, of course, consider the factors set forth in 18 U.S.C. § 3553(a) in fashioning an appropriate sentence that is "sufficient, but not greater than necessary, to comply" with the following purposes: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a).

While a court may not presume that a sentencing guidelines sentence is necessarily the appropriate sentence, "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6.  Their bearing throughout the sentencing process stems in part from the fact that "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*,

13

551 U.S. 338, 348 (2007).  "[I]n the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"  *Kimbrough*, 552 U.S. at 89 (citation omitted).  Where a court decides to vary from the Guidelines, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variance."  *Gall*, 552 U.S. at 50.

In this case, a sentence at the upper end of the Sentencing Guidelines range of 63 to 78 months is an appropriate sentence – not presumptively or reflexively –  but because it appropriately reflects all of the sentencing factors set forth in 18 U.S.C. § 3553(a).

## B.  Nature and Circumstances of the Offense

### 1.     The Seriousness of Defendant's Criminal Conduct

In this case, the defendant committed criminal offenses of an unquestionably serious nature.  In enacting the Economic Espionage Act of 1996, Congress underscored the seriousness of the misappropriation of trade secrets from American companies and the impact of such conduct on the American economy.  As the Senate Report stated:

> In a world where a nation's power is now determined as much by economic strength as by armed might, we cannot afford to neglect to protect our intellectual property.  Today, a piece of information can be as valuable as a factory is to a business.  The theft of that information can do more harm than if an arsonist torched that factory . . ..
>
> The value of the information is almost entirely dependent on its being a closely held secret.  In includes, but is not limited to, information such as production processes, bid estimates, production

14

> schedules, computer software, technology schematics, and trade
> secrets. It is, in short, the very information that drives the American
> economy. For many companies this information is the keystone to
> their economic competitiveness. They spend many millions of dollars
> developing the information, take great pains and invest enormous
> resources to keep it secret, and expect to reap rewards from their
> investment.

S. Rep. No. 359, 104th Cong., 2nd Sess. (1996).

In this case, the SDSs and ARLs stolen by the defendant are of vital importance to Ford's business operations. The value of the SDSs and ARLs to Ford is only partially reflected in the significant loss amount in this case. As David G. Leitch, General Counsel of Ford, wrote to this Court:

> The ten (10) ARLs and forty-one (41) SDSs stolen by Mr. Yu
> cover the major systems of a global vehicle – in essence, the 'DNA'
> found in all Ford vehicles . . . This 'DNA' has enormous value to
> Ford. It represents over 100 years of experience building cars and
> trucks around the world. At the heart of Ford's One Ford plan, Ford
> will use this DNA to build world class small, medium, and large cars,
> utility vehicles, and trucks. The competitive implications of a relatively
> new automaker in a low cost country obtaining this DNA and being able
> to build cars on the basis of Ford's expertise would be devastating, both
> to Ford and the auto industry in the U.S.

(Attachment A). The defendant put at risk the competitiveness of a major automotive company headquartered in Detroit by stealing its trade secrets. This type of conduct is particularly harmful in light of the difficult challenges faced by the automotive industry in recent years.

The seriousness of the defendant's conduct is also illustrated in the vast amount of confidential information he purloined from Ford and others. The SDSs and ARLs

15

represent only a portion of the 4,000 Ford proprietary documents which the defendant misappropriated.  In addition, the defendant stole hundreds of trade secret documents owned by a client of Foxconn as well as hundreds of proprietary Foxconn documents.

In its Sentencing Memorandum, the defendant attempts to minimize the seriousness of the offense by the remarkable claim that he "did not go to work for a competitor" of Ford.  (Defendant's Sentencing Memorandum at 6, 12.)   In fact, in January 2006, the defendant went to work for a competitor of Ford – the Jiang Huai Automotive Company – *while* the defendant worked for Ford and, according to the email received by Ford, provided Ford trade secret information to that company in his effort to secure employment there.  Even the defendant admits that he took Ford trade secrets to that job and showed Ford trade secret information to Jiang Huai representatives during a presentation while employed there.

After working for Foxconn, the defendant then took a job with another competitor of Ford – the Beijing Automotive Company. The defendant copied all of the Ford SDSs and ARLs to his BAC work computer and accessed all of the SDSs while employed there. While the defendant claims that he had no intent to sell the Ford trade secrets, the evidence indicates that, at a minimum, he used those trade secrets for the benefit of Chinese competitors of Ford.

> **2.    The Lengthy Duration and Extensive Character Of Defendant's Criminal Conduct**

In this case, the defendant's fraudulent conduct was of significant breadth and

duration.  Throughout the time period from 2005 to 2009, the defendant repeatedly distributed or showed Ford trade secret information to a number of representatives of Chinese automotive companies and others.

The defendant first misappropriated Ford trade secret documents as early as 2005, and, according to the email received from Ford, provided Ford documents to a Ford competitor in 2005.  By the defendant's own admission, he showed Ford trade secrets to Foton in 2005 and to Jiang Huai representatives in January, 2006.  In December 2006, the defendant stole over 4,000 proprietary documents from Ford.  Later that month, he left the Ford documents in the possession of a Foxconn manager for a month.  During a search for new employment in March 2008, the defendant created a document from Ford trade secret documents, clearly intending to provide it to SAIC, a competitor of Ford.  The defendant admitted that in August, 2008, he showed that same document to Chery Automotive, another competitor of Ford.  When the defendant left his employment with Foxconn in November, 2008, he stole hundreds of confidential Foxconn documents and third-party trade secret documents.  In January, 2009, the defendant provided his personal laptop containing the Ford SDSs and ARLs to a BAC colleague.  During his employment at BAC, the defendant admitted that he provided an SDS to a colleague and that he used two SDSs in conjunction with his own BAC work.  During his employment with BAC, the defendant accessed all of the Ford SDS and ARLs.  After leaving Foxconn, he also accessed their proprietary documents.

The government submits that in his proffer, the defendant minimized his conduct, providing suspect answers to key questions regarding his use of the Ford documents.  In light of the defendant's access to all of the Ford SDSs during his BAC employment, it is evident that the compromise of the Ford information was much more extensive than the defendant himself admits.

The defendant's activities in this case evidence a pattern of criminal conduct over an extended period of time.  In light of the extensive nature of the defendant's criminal conduct and its duration, a sentence at the high-end of the sentencing guidelines range is warranted.

## C.  History and Characteristics of the Defendant

Under 18 U.S.C. § 3553(a)(1), the Court should also consider the history and characteristics of the defendant.  In this case, the repetitive nature and pattern of the defendant's criminal activity reflect a pervasive, ingrained mode of operating in complete disregard of the law and of the proprietary rights of Ford.  At a minimum, the facts demonstrate that the defendant readily shared Ford's trade secrets whenever it would advantage his employment prospects or when his work or that of his colleagues at BAC would benefit from the information.

In addition, in committing the offenses at issue, the defendant abused his position as a trusted employee of Ford.  After the defendant accepted employment with Foxconn, he failed to inform Ford of his new employment.  Instead, the defendant used his access

to Ford trade secrets during his last days of employment to download several thousand confidential documents to an external hard drive for purposes of taking them with him to China. In doing so, the defendant disregarded promises he had made in his employment agreement not to take any Ford documents with him when his employment with Ford ended. He also lied by omission during his exit interview when he remained silent in the face of a reminder not to leave Ford with any of the company's documents.[5] The defendant also betrayed the trust placed in him by Foxconn and by Foxconn's client in stealing their documents at the time he left Foxconn's employ.[6]

The defendant has also demonstrated a pattern of deceit. In January, 2005, he lied to Ford, claiming that his mother had a heart attack, so he could go work for a competing automotive company in China. He then quit, lying to that company that health problems necessitated his return to the United States. During an exit interview at Ford, the

---

[5] This was not the first time the defendant betrayed Ford's trust. From 2002 through 2004, unbeknownst to Ford, the defendant operated a company called Rosette Technology. This company was described as a technology integrator for the Chinese automotive industry and a provider of services to steering column suppliers. At one time, the defendant sought investors to enable his company to begin production of electronic power steering core devices. During the investigation, the FBI recovered the defendant's Rosette business card, the back of which listed numerous automobile components as "products represented" by the company. The defendant's Rosette activities represented a clear conflict of interest with his Ford employment.

[6] The Presentence Report suggests that the Court may wish to consider a downward variance based on the defendant's "consistent verifiable employment history for over twenty years." (Presentence Report, page 17, ¶ 79). As the government noted in its comments on the report, a downward variance on this basis would be exceedingly inappropriate considering that the defendant used his employment to steal highly sensitive trade secret information from two of his four previous employers.

defendant remained silent when reminded of Ford's prohibition against taking Ford documents after employment ended.  At the time, the defendant had left Ford trade secrets with a Foxconn manager in China and had Ford trade secrets on a laptop and one or two thumbdrives.  In addition, during an interview with Ford security, the defendant insisted that he did not interview with Chinese automotive companies and only "visited" them. The defendant also omitted any mention of sharing Ford trade secrets with two of those companies.

The defendant's statements during proffers with the government similarly demonstrate the defendant's deceit and his attempts to minimize his criminal conduct. The defendant claims that he stole the Ford documents to "refresh" the knowledge that he acquired from working with Ford when nearly all of the SDSs had nothing to do with any work he did at Ford.  His explanation for copying Ford documents to his BAC laptop is similarly suspect.  Again, he claims that he did so in order to have the documents on hand to "refresh" his knowledge.  This implausible explanation, coupled with the forensic evidence that all Ford SDSs were accessed during the defendant's BAC employment leads to the fair inference that the defendant used or provided the Ford SDSs for the benefit of BAC.

The defendant also claims that he accessed the Ford intranet to obtain copies of three electronic SDSs because his supervisor had mentioned the possibility of tasking him with an assignment related to the window regulator program.  Not only did the

defendant's supervisor contradict the defendant's claim, it is implausible that the defendant downloaded the entirety of three SDSs – all of which just happen to be related to the principal business of his new employer – when he had accepted a new job and had only two business days left at Ford.

In light of the defendant's utter disregard for the proprietary rights of Ford, his abuse of his position of trust at both Ford and Foxconn, and his pattern of deceit, a sentence at the upper end of the sentencing guidelines range is warranted.

**D.    The Need To Avoid Unwarranted Sentencing Disparities**

The defendant's sentencing memorandum selectively focuses on sentences in other trade secret cases in arguing for a sentence far below the sentencing guidelines range in this case, claiming that such a sentence will avoid unwarranted sentencing disparities. Comparing this case to the cases cited by the defendant, however, is misleading. "The goal of 18 U.S.C. § 3553(a)(6) is to eliminate "'disparities among defendants with similar records who have been found guilty of similar conduct.'" *United States v. Smith,* 510 F.3d 603, 610 (6th Cir. 2007) (quoting *United States v. Davis,* 458 F.3d 491, 495-96 (6th Cir. 2006)). A review of those cases illustrates that they do not involve defendants who have been found guilty of similar conduct.

In *United States v. Agrawal*, Case No. 1:10-cr-00417 (S.D.N.Y. 2011), for instance, the loss amount was $10 million, one-fourth of the value of the Ford trade secrets stolen by the defendant. In addition, there is no indication in the defendant's

21

sentencing memorandum of the sentencing guidelines range applicable in that case or the reasons that the court may have found a downward variance or departure appropriate. As such, one cannot conclude that this defendant stands in similar shoes to the defendant in *Agrawal*.

The defendant's reliance on *United States v. Min*, 1:06-cr-00121 (D. Del. 2007) as a comparable case is also misplaced. The defendant in *Min* was sentenced to 18 months' imprisonment. In *Min*, law enforcement recovered the trade secret information from the defendant's apartment and storage facility before the information was disclosed to a third party. In addition, the defendant proffered on some nine occasions at the conclusion of which the government was reasonably assured that DuPont's trade secret information had not been disclosed to a third party. For these reasons, the government agreed to a $180,000 loss representing DuPont's costs in responding to the crime, rather than the $400 million fair market value of the documents. According to the prosecutor in the case, these facts played a significant role in the court's sentence and led the court to vary downward six months from an agreed sentencing guidelines range of 24 to 30 months' imprisonment.

The case of *United States v. Lee*, 1:09-cr-00290 (N.D. Ill. 2010) in which the defendant received a 15 month sentence is also inapposite. There, the defendant stole paint formulas from Valspar, uploading them on to two thumb drives. Law enforcement was successful in recovering the trade secret information during a search of the

22

defendant's house the night before he flew out to China.  Other investigative results confirmed that the information had not been disclosed to a third party.  The loss amount in *Lee,* between $7 and $10 million, was also less than in this case.  Finally, the defendant suffered from prostrate cancer, which, according to the prosecutor assigned to the case, the court found to be a strong fact in mitigation at sentencing.

This case bears no resemblance to *Min* and *Lee*.  The defendant here took Ford's trade secret information to China in both 2005 and in 2006.  By his own admission, he shared that information with a number of representatives of Chinese automotive companies, used Ford trade secrets in conjunction with his work, and shared them with a BAC colleague.  The defendant's account during his proffer, unlike *Min*, did not provide any assurance to the government, or to Ford, that Ford trade secret documents had not been transmitted to a third party.  On the contrary, the defendant's account is suspect in several respects, including his failure to satisfactorily explain his accessing of all forty-one Ford SDSs on his BAC work computer while working for that company.   There is every reason to believe that the defendant used or distributed all forty-one SDSs for the benefit of a competitor of Ford.

The case of *United States v. Liu*, 2:06-cr-20031 (E.D. Mich. 2006) is also not comparable to the instant case.  There, the defendants received sentences of 30 months' imprisonment, 9 month's imprisonment, and 18 months' probation with 6 months' confinement.  In *Liu*, the loss amount was only $1 million, a sum significantly lower than

the loss amount here.  In addition, the government extended plea offers in *Liu* that

contemplated relatively short sentences in order to achieve a global settlement as to all

three defendants.

The defendant in *United States v. Lin*, Case No. 6:07-cr-06083 is also not

comparable to defendant Yu.  Lin operated as the agent of a Taiwanese company to buy

trade secret information of Corning that had been stolen by another individual. The value

of trade secrets at issue exceeded $50 million.  According to the prosecutor in that case,

the court sentenced defendant Lin to 30 months' imprisonment, a below guidelines

sentence because of the defendant's age and poor health.  The defendant here seems to

suggest that he should be subject to lesser penalties than *Lin* because "there is no

evidence that Mr. Yu acted as fence [sic] for Ford's trade secrets."  (Defense Sentencing

Memorandum at 10.)  In this case, the defendant's culpability and role are greater than

that of defendant Lin.  Unlike Lin, the defendant here used his position as a trusted

employee of Ford to access and steal the trade secrets himself.  The sentencing guidelines

range for the individual who stole the trade secrets in the *Lin* case, defendant Jonathan

Sanders, was 60 months' imprisonment.  He received a 48 months' sentence as a result of

a §5K1.1 downward departure motion by the government.  (Case no. 6:06-cr-06005,

(W.D.N.Y. 2011), Docket entries 13 and 18.)

The probationary sentences initially imposed by the district court in the case of

*United States v. Yang* have no relevance to the instant case.  The district court applied a

24

downward departure to each of the defendants based on its view that the victim company was overly involved in the government's investigation. *United States v. Yang*, 281 F.3d 534, 546-47 (6th Cir. 2002). The Sixth Circuit Court of Appeals found that the district court had abused its discretion by departing downward. *Id*. In addition, the district court's sentence was based on a loss amount of $890,000, the value of only one adhesive formula, a loss amount far short of that here.

In *United States v. Williams*, 526 F.3d 1312 (11th Cir. 2008), the lead defendant received a 96 month sentence of imprisonment. Defendant Williams was employed by Coca-Cola and stole the Coca Cola recipe and tried to sell it. Her co-defendant, Dimson, acted as a broker to sell the trade secrets. Dimson received a sentence of 60 months' imprisonment. Both sentences were above the sentencing guidelines range. The nature of the information stolen by defendant Williams is comparable to that stolen by this defendant. Like Williams, the defendant here stole the recipe or "DNA" for Ford vehicles. In his sentencing memorandum, defendant erroneously argues that the "higher sentences reflect the heightened risk posed by concerted group activity." (Defendant's Sentencing Memorandum at 11). In fact, the district court " . . . attached great weight to one factor, the seriousness of the offense . . .", including the harm Coca-Cola could have suffered if Williams and her co-defendants had been successful in selling the trade secrets to a competitor and "the danger to the United States economy these crimes pose." *Williams*, 526 F.3d at 1322. While the defense asserts that a co-defendant's 24 month

sentence is "more in line with other cases," (Defendant's Sentencing Memorandum at 11), in fact, this co-defendant cooperated with the government, testified against defendant Williams, and received a substantially reduced sentence as a result. *Williams*, 526 F.3d at 1322.

Defendant Yu is comparable to the defendant in *United States v. Aleynikov*, 1:010-cr-00096 (S.D.N.Y. 2011), who received a 97 month term of imprisonment.  In that case, the defendant stole computer code supporting Goldman Sachs' high-frequency trading system.  The defendant accepted a job at a new company to develop a version of the same computer platform.  On his last day working at Goldman Sachs, the defendant transferred substantial portions of Sachs's computer code to an outside computer server.  He then flew to Chicago to attend meetings at the offices of his new employer, bringing with him his laptop computer and another storage device containing Sachs's proprietary source code.  He was arrested when he arrived at Newark Airport following that visit.  These basic facts resonate with the facts of this case.

The defendant attempts to distinguish himself from Aleynikov, arguing that the defendant "did not go to work for a competitor."  (Defendant's Sentencing Memorandum at 12.)  The defendant, in fact, worked for two competitors of Ford – Jaing Huai and Beijing Automotive Company – and provided Ford trade secret information to employees of both companies.  The defendant's also assert that he "stands in stark contrast to Aleynikov's sinister motive in pilfering his employer's program to land a job . . .".  *Id.*

This is precisely what the defendant did in 2005 in taking Ford trade secret information to China in conjunction with his interviews with Chines automotive companies.  Again, during a job hunt in 2008, the defendant created a document from Ford trade secrets for purposes of sharing it with SAIC, a prospective employer.  The defendant shared the same document with Chery, also a competitor of Ford, while seeking employment there.

In an effort to further distinguish himself from Aleynikov, the defendant points to measures which Aleynikov took to plan and cover up his activities.  (Defendant's Sentencing Memorandum at 12).  Those measures, however, were cited by the government in its sentencing memorandum to support an upward adjustment for employing sophisticated means.  (*See United States v. Alynikov*. 1:010-cr-00096 (S.D.N.Y 2011), Gov't Sentencing Memo at 23-24, Docket entry 136).  The fact remains that the defendant Aleynikov's core conduct was comparable to the defendant's in this case.

All of the cases cited by the defense in support of a below guidelines sentence are distinguishable from the instant case on the basis of the conduct at issue, the loss amount, or the cooperation of the defendant.  The factual uniqueness of each case underscores the fact that it is the Sentencing Guidelines which provide an objective sentencing range that promotes the overall goal of minimizing unwarranted sentencing disparities.  *Booker v. United States*, 543 U.S. 220, 253 ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity,").  The Guidelines serve to minimize disparities because they are "the product of careful study

based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall*, 552 U.S. at 46. The Commission is charged by statute to periodically review and revise the Guidelines as the Commission collects comments and data from numerous sources in the criminal justice system. 28 U.S.C. § 94(o). In this case, the Guidelines were specifically amended in November 2009 to include Application Note 3(C)(ii), which sets forth suggested ways of estimating the intended loss amount, and thus calculating the offense level. It is clear that the Sentencing Commission has recently reviewed and revised the Guidelines in connection with this specific offense.

The facts present in this case make the defendant deserving of a lengthy prison sentence as reflected in the Sentencing Guideline range. The defendant's serious criminal conduct threatened Ford's business operations and involved the theft of many extremely valuable design documents. Nothing in the defendant's background excuses his actions. In short, the defendant should be sentenced within the Sentencing Guidelines range that applies specifically to the facts of this case.

**E.**     **The Need For General Deterrence and Respect For The Law**

A prison sentence within the higher end of the sentencing guidelines range will also satisfy the important sentencing goal of deterrence, both specific and general. Such a sentence will serve notice that stealing valuable trade secrets is a serious offense which will be punished with substantial penalties. This case has received significant press attention, which strengthens the general deterrent effect here.

28

The need for general deterrence is significant in this type of case.  First, this is a significant crime that if not deterred could have serious consequences on the economy and employment.  Trade secrets of U.S. companies – particularly those of automotive companies in this state – must be protected in order to preserve their competitiveness and viability.  Second, intellectual property is easily stolen by insiders with access. "Employees who steal company secrets and take them to a new employer, or use such information to start a new company are a frequent source of trade secret misappropriation."  *China: Intellectual Property Infringement, Indigenous Innovation Policies, and Frameworks for Measuring the Effects on the U.S. Economy*, United States International Trade Commission Publication 4199 (amended), November 2010 at 4-10.[7] It is important to give others similarly situated as the defendant was, with access to trade secrets, significant pause before taking action to undermine the competitiveness of U.S. companies.  A sentence at the upper end of the Sentencing Guidelines range will advance that objective.

---

[7]  This publication is available at www.usitc.gov/publications/332/pub.4199/pdf.

## III.  CONCLUSION

For all of the foregoing reasons, the government respectfully requests that the Court impose a sentence at the upper end of the Sentencing Guidelines range of 63 to 78 months' imprisonment.


BARBARA L. McQUADE
United States Attorney

s/Cathleen M. Corken
Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-0206


Dated: April 6, 2011

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2011, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

David F. DuMouchel
Joseph E. Richotte

s/Cathleen M. Corken
CATHLEEN M. CORKEN
Assistant United States Attorney

31